[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DISCUSSION Re: FINDINGS OF FACTS:
In December of 1985 after six (6) months of intensive training which required that she live in residence at the State Police Barracks in Meriden, Cynthia Peruginni graduated from the State Police Academy. Her course of instruction during this six (6) months training period included the subject of stopping and approaching motor vehicles including tractor trailer trucks. Immediately after graduation she was assigned to Troop A in Southbury where she remained until June 21, 1986, the date of the tragic death of plaintiff's decedent, Harron Waller. On this date CT Page 3697 at approximately 5:20 a.m. Harron Waller, a 46 year old self-employed truck driver and father of four (4) was operating a tractor trailer truck on I-84 East bound when he was stopped for a speeding violation by Trooper Peruginni. He was enroute to the Bekin Furniture Co. in Boston, Massachusetts where he was to drop off a truck load of furniture.
Within minutes after being stopped, plaintiff's decedent was mortally wounded when his body was violently impacted by a hit and run automobile. After impact, Waller's body struck Trooper Peruginni knocking her under her cruiser. As a result of being struck by this hit and run automobile, Waller suffered a traumatic amputation of his lower left leg and massive internal injuries which resulted in his death. Trooper Peruginni suffered a fractured ankle for which she was hospitalized for two (2) weeks. Based on his analysis of physical evidence located at the scene, Dr. Henry Lee, of the State Forensic Lab, determined that the hit and run automobile was a metallic brown 1974 Mercury Monarch. It was subsequently determined that at the time of the accident the vehicle was being operated by Yolanda Daniels. The vehicle was discovered the next day in the parking lot of the apartment complex where she lived in Waterbury.
The only known eyewitness to the events leading up to the death of Harron Waller are Trooper Peruginni and Yolanda Daniels. Although Daniels had a passenger in her motor vehicle, he was asleep with his head in her lap and did not witness the accident. Likewise, two (2) individuals who later emerged from the trailer portion of Waller's truck slept through the entire incident and did not see anything. Trooper Peruginni testified that at the time he was struck, Waller was located at the left front bumper area of the cab of his tractor trailer truck well within the shoulder portion of the highway. Yolanda Daniels testified that both Trooper Peruginni and Waller were in the right travel lane of the highway at the point of impact.
This court is called upon to evaluate the testimony of these eyewitnesses and determine whose account of these events is more credible. In reaching this determination, the court must decide whose version is best supported by the physical evidence.
DISCUSSION Re:
Testimony of Trooper Cynthia Peruginni: CT Page 3698
At the time of the accident resulting in Harron Waller's death on June 21, 1986, Trooper Peruginni was nearing the end of an 11:00 p.m. to 7:00 a.m. shift. At 0:500 hours military time, after conducting numerous D.W.I. stops, she decided to set up radar in I-84 East bound between exits 16 and 17 near the South Street overpass. She mounted her radar detection unit in the back driver's side window of her State Police cruiser. She was utilizing a spare cruiser that had been parked in the Troop A parking lot prior to the start of her shift. At approximately 5:20 a.m. Trooper Peruginni clocked Harron Waller travelling at approximately 70 mph. I-84 is a limited access highway with a posted speed limit of 55 mph. I-84 East bound, in the area between Exits 16 and 17 consists of two (2) lanes of travel and a shoulder area.
Trooper Peruginni put her vehicle in drive and began driving behind Waller's tractor trailer truck. It is her testimony that she activated her roof rack lights, wigg wagg and siren, then changed to the left lane pulling alongside Waller's truck. She subsequently changed lanes to the right pulling in front of Waller's truck and activating her right turn signal. She stayed with the speed of the truck until Waller began to slow down. Because the tractor trailer truck didn't slow down right away, the Trooper believed that Waller may have been experiencing difficulty with his brakes. She cannot recall how far the tractor trailer truck travelled or how much time went by between the time she put her vehicle in drive and the time Waller stopped. She was unable to visualize him until he pulled over.
At the time the stop was effected, Trooper Peruginni parked her cruiser in front of the cab of the truck within the shoulder area of the highway. She then looked into the rear view mirror of her cruiser and observed Harron Waller running towards her. She got out and met him between the rear of the cruiser and the front of the cab. She instructed Waller to get his license, registration and log book and meet her in front of the cab. Without saying a word, Waller headed back to the cab. She watched him walk down the shoulder, walk up the steps, get into the cab and close the door. In the meantime, the trooper walked from the front of the cab to the passenger side of the truck to inspect the brake lines which are located between the cab and the truck. This took approximately 10 to 20 seconds. The trooper then returned to the front of the cab where she had instructed Waller to meet her. He was not there. The trooper located him standing at the side of the trailer section of the truck. She recalls that she said to CT Page 3699 Waller, "I told you to meet me in front of the cab." At this time the trooper was standing off to the right of the white line facing the cab, almost even with the bumper of the cab. Waller was standing on the saddle tank stair looking toward the tank reading from a book. There was another book on the stairs.
Trooper Peruginni started moving backwards facing the center of the cab with her back to the cruiser. It is her testimony that she never lost sight of Waller who responded, "I got it" and began walking towards her within the shoulder area of the highway. They were face to face less than three (3) feet apart, in motion, close enough that she was able to take his papers at arms length. She was facing North-West. Waller was facing South-East. He was in the left front bumper rear of the cab. The next thing that the trooper recalls is that his body hit hers and they went flying. An umph sound came from Waller. She ended up under her cruiser with her head facing east under the bumper. She never lost consciousness. When she crawled from under the cruiser she saw Waller lying to her right towards the guard rails. His head was towards the cruiser, his extremities more toward the grassy area. His head was almost under the bumper of the cruiser. He was face up.
At this point, Trooper Peruginni, who was unable to walk, crawled to the front of her cruiser. As she did this she was assisted into the cruiser by an unidentified good samaritan. She used her cruiser radio to call Troop A for help. She stated "we were hit" and gave her location. She then asked the good samaritan to check Waller. She was told that he was still alive but that his vital signs were very low. It was suggested that she move her cruiser forward because the exhaust from the cruiser was blowing into Waller's face. The good samaritan suggested that the trooper appeared to be going into shock and asked whether she had a blanket. She popped the lid of the trunk in order for him to retrieve a blanket. After he placed the blanket over her, she never saw him again.
The first person the trooper recalls arriving at the scene was Sgt. Guyette. The trooper told Guyette that they were hit but she didn't know what struck them. She never saw any headlights. The court took judicial notice of a 5:23 a.m. sunrise on June 21, 1986. The weather was clear and dry.
DISCUSSION Re: CT Page 3700
Testimony of Yolanda Daniels
Yolanda Daniels testified that she got off work at 7:30 p.m. on the night of June 20, 1986 after a 7:00 p.m. staff meeting at the subway shop on West Main Street in Waterbury were she had worked for two (2) years as a manager. At 7:30 she went to the Bowery Cafe with friends on foot where she remained until 11:00 or 11:30 p.m. During this time span she consumed four (4) to five (5) rum and cokes. At 11:30 she returned to the subway parking lot with friends where they got into her car and she drove to the Sitting Bull Cafe in Waterbury where she remained until closing at 1:30 a.m. She consumed more rum and cokes at this location. All total she estimates that she consumed approximately ten (10) rum and cokes during a period of six (6) hours. She denies that she smoked a joint or took valium as earlier indicated by one of her friends.
After the Sitting Bull Cafe closed, Daniels returned to the subway shop with friends where she ate a sandwich. She then agreed to drive a friend to Oxford. On the return trip to Waterbury, she took a wrong turn and ended up in Danbury. She was lost for 40 to 45 minutes. The sun was beginning to come up, she was tired and feeling the effects of the alcohol. She rolled down her window and turned on the radio in an attempt to stay awake. She was starting to fall asleep. Her head went down, she heard a thud, the car shook, she hit something. The thud woke her up. At some point she looked up and saw people in the road. She saw a car, a truck and two (2) people. They weren't on the side of anywhere. They were right there in front of her. They were by the door of the cab of the truck but further out in the road.
When she arrived at her home, her boyfriend, (now husband), Phil Jannick, was furious because she was out all night. They had a loud argument. He wanted to go to work and she didn't want him to go. He followed her to the bathroom. She had something on her leg that she thought was blood. He said it was sauce from the subway shop. She told him, "baby they were in the road," and that she thought she hit somebody. She went to bed but was unable to sleep because she saw the accident over and over again. She went outside to look at the car. She had trouble with the car door on the passenger side. The windshield was smashed and the antenna broken. There was blood on the car.
At about 12:00 noon she called Karen Kennedy and told her that she thought she hit somebody. Karen said that she had a CT Page 3701 friend who could find out. Subsequently Waterbury detectives arrived and questioned Daniels. Initially she denied driving the car because she claims that Karen told her to deny it. She told the truth after she found out that someone had died. The police were around the house all day in the parking lot. They were all over the car and eventually they took it. She was arrested on June 25, and taken to the Southbury State Police Barracks. She was driven from Southbury to Niantic where she remained for 21 days before making bond. On May 1, 1987 she returned to Niantic to serve 14 months. While in Niantic, she received psychiatric treatment of an undisclosed nature. Subsequently she was released to the Morris Foundation for alcohol treatment. She spent 30 days there followed by four (4) months in a half-way house. She earned a nursing certificate while in Niantic.
Evaluation of Eyewitness Testimony
Of the two (2) eyewitnesses at the scene of the accident, Trooper Perugini was in the better position to accurately observe, perceive and report the events which immediately preceded the death of Harron Waller. She was facing Waller at the time he was struck by the Daniel's vehicle. Therefore, she was physically in a position to observe his movements. She testified that she never lost sight of Waller as he walked from the area of the saddle tank to the left front edge of the cab bumper where he was struck by the Daniel's vehicle. She never lost consciousness after the accident. Her perception of the events taking place around her was not impaired by the ingestion of alcohol. She was awake and alert.
Yolanda Daniels, on the other hand, was feeling the effects of the ingestion of approximately 10 rum and cokes over a six (6) hour period. There was testimony that in fact she was under the influence of multiple intoxicants. Her ability to perceive the events going on around her was impaired by a combination of alcohol and fatigue as is evidenced by the fact that she had spent 40 to 45 minutes prior to the accident lost, unable to find the highway back to Waterbury from Oxford, ending up in Danbury instead. This court is persuaded that Yolanda Daniels did not actually observe where Herron Waller was located at the point that his body was impacted by her automobile. By her own account, her head went down, she was asleep and did not awaken until she heard a thud and the car shook. In fact, she testified that she did not stop at the scene because she didn't know what she hit. If it's her position that she didn't know what she hit, how can she be so CT Page 3702 certain where what she hit (which she never saw) was located when she hit it?
The plaintiff urges this court to find that Trooper Peruginni lied under oath to protect herself or that her testimony is so colored by her personal interest in the outcome of the case that it is unworthy of belief. This argument is not persuasive. After careful consideration of the evidence presented at trial, this court finds Trooper Peruginni to be a credible witness whose account of the circumstances surrounding the death of Herron Waller is supported by the physical evidence located at the scene and buttressed by the testimony of other witnesses whose testimony the court also finds credible.
THE PHYSICAL EVIDENCE LOCATED AT THE SCENE SUPPORTS TROOPER PERUGINNI'S ACCOUNT OF THE EVENTS WHICH RESULTED IN THE DEATH OF HERRON WALLER:
DISCUSSION Re: Testimony of Expert Witnesses:
This court will briefly discuss the expert testimony it finds significant and persuasive. Given this court's ruling that it has no jurisdiction over these cases, the court will not go into great detail re: the expert testimony presented at trial but will highlight the expert testimony it finds persuasive in reaching its determination that the State prevails on the merits of the case.
At trial defendant introduced Defendant's Exhibit 9 which consisted of a pre-trial memo submitted to the court by plaintiff on October 4, 1990. In the body of this document plaintiff advances a version of the events resulting in the death of Herron Waller which places him in the shoulder area of the highway when struck. Even if this document is completely ignored by this court, there is sufficient additional evidence to establish that in fact, at the time he was struck by the Daniel's vehicle, Waller was inside the shoulder area of the highway.
Dr. Henry Lee, a forensic scientist skilled in evaluating and interpreting blood splatter patterns, testified that he conducted a "strip search" or inch by inch examination of the entire area surrounding the site of the accident beginning approximately five (5) feet behind the trailer of Waller's truck moving forward to the area east of the cruiser where Waller's amputated left leg was located. CT Page 3703
Dr. Lee found the discovery of 2,000 individual blood splatters concentrated in one area on the rear left side of the cruiser extremely significant in arriving at his opinion as to the location of Herron Waller at the time this blood source and resulting blood splatter pattern was created. His analysis of a sample of his blood determined that it is Herron Wallers and that the blood splatter pattern created is indicative of a large burst of blood emitted from a single source located approximately 10-15
feet from the trunk parallel to the trunk and inside the right shoulder line.
Dr. Lee theorizes that the blood came gushing out a split second after Waller was struck and that his long trousers only minimally, if at all, affected the timing of the distribution of the blood. It is Dr. Lee's expert opinion that plaintiff's theory that Waller was in the travelled portion of the highway in an area between the saddle tank and the cab door as presented by her expert Eugene Baron is unsupported by the physical evidence. Dr. Lee testified that he searched every inch of the accident scene and failed to find any blood in the travelled portion of the highway, except that found east of the cruiser where Waller's amputated left leg was located. Dr. Lee found it significant that no blood was found in or near the area between the saddle tank and cab door or on the travelled portion of the highway in this area, as would be expected had Waller been struck while located in this area. Dr. Lee is adamant that Waller's blood came gushing out within a split second after impact, and thus, there would he blood found in the area where he was struck.
The plaintiff spent much time and effort focusing on the evidence which Dr. Lee chose not to analyze, in an attempt to discredit him. It was inferred that Lee's failure to analyze certain pieces of evidence was either part of a grand design to withhold evidence to serve his own interests or the result of incompetence. The court is satisfied with the reasonableness of Dr. Lee's response in regard to these allegations. He has a very busy case load, there was no need to analyze every item discovered once he had identified the offending vehicle with 100% certainty, having received notice in May of 1987 that the criminal case against Daniels was resolved, he believed that his job was completed. The court is satisfied that Dr. Lee's decision not to analyze certain items of evidence was a practical one, based on the demands placed on his time and not an indication of incompetence or an attempt to withhold evidence. CT Page 3704
Perhaps it is worth mentioning here that plaintiff objected to any expert testimony by Dr. Lee in regard to the path of travel of the Daniels' vehicle on the grounds that he was not disclosed as an expert on this issue. It was clearly established that defendant had disclosed that Dr. Lee was expected to testify that Waller was inside the shoulder area of the road when struck. The court did not rely on Lee's testimony to determine the path of travel of the Daniels' vehicle, but rather to determine where Waller was located when struck as evidenced by the blood splatter pattern made on the rear of the cruiser. This court also drew logical inferences from the facts as found by the court. It is apparent that if the court found that Herron Waller was within the shoulder area of the highway when struck and he was struck by the Daniels' vehicle, the court also finds by inference that the Daniels' vehicle was at some point within the shoulder area of the highway. The better explanation on this issue was presented by Sgt. Gawe, who described the motion of the Daniels' vehicle as a drifting motion into the shoulder area of the road, striking Waller. A drifting motion of the Daniels' vehicle is consistent with someone falling asleep at the wheel, as admitted by Daniels.
Plaintiff's expert, Eugene Baron theorized that at the time of impact, Waller was in the travelled portion of the highway between the saddle tank and the cab door of the truck. He was called upon to give his expert opinion regarding the path of travel of the automobile itself. It is significant that plaintiff's expert based his theory upon the erroneous belief that after impact, Waller's body came to rest on the left side of the cruiser in the bumper area when in fact, Waller's body came to rest on the right side of the cruiser in the bumper area. When the correct information was supplied to plaintiff's expert, he agreed that this somewhat modified his opinion. As earlier indicated, the court further finds that plaintiff's expert's theory regarding the point of impact is unsupported by the actual physical evidence such as the blood splatter pattern described by Dr. Lee, and the absence of blood at plaintiff's expert's theoretical point of impact. Additionally, Baron seems to rely heavily on the unscientific assumption that Waller was probably struck in the area where his log books were found because it is his experience that truckers just don't leave those books laying around.
The court gave no consideration whatsoever to references made by defendant to a tire mark found at the scene or a brownish smear found on the cruiser since it was never established that either CT Page 3705 had anything to do with this accident. The fact that Sgt. Gawe factored in this paint smear in reaching his theory re: the path of travel of the Daniels' vehicle deducted from the credibility of his testimony. Dr. Lee's testimony that soil debris located behind the rear of the cruiser indicates that it was moved forward following the accident supports Trooper Peruginni's claim that she moved her cruiser forward after an unidentified good samaritan informed her that the exhaust was blowing into Waller's face and further buttresses her testimony. The court finds that the evidence does not support plaintiff's alternative theory that even if Waller were inside the shoulder, the trooper is still negligent in that she allowed him to stand stationary in an area between the cruiser and the cab, which is contrary to State Police policy. The physical evidence relative to Waller's injuries supports the trooper's claims that Waller was in stride, in motion being led to the grassy area of the shoulder.
Finally, plaintiff claims that Trooper Peruginni was inadequately trained at the State Police Academy or that in the alternative she failed to comply with established policies regarding the stop and approach of motor vehicles. Insufficient evidence was presented at trial for this court to make the determination that the trooper was inadequately trained. No evidence was presented regarding the training of State Police officers in other jurisdictions which the plaintiff claims is adequate. Therefore, there is no basis for the court to evaluate the adequacy of the training of Connecticut State Police officers. Furthermore, it is the testimony of Sgt. Salzano, who teaches the subject of stopping and approaching motor vehicles at the Connecticut State Police Academy, that in all respects, Peruginni's stop of the Waller vehicle is "a text book stop." There was further testimony that most advantages of parking to the rear when stopping pleasure vehicles do not apply when dealing with large commercial vehicles. In fact, it was suggested that in 1986 when troopers did not have access to portable radios, it may have been safer and more advantageous for the trooper to park in front of a tractor trailer unit in order to be closer to the cruiser radio and the truck driver. Plaintiff's expert Eugene Baron admitted that in fact, on occasion he had parked his cruiser in front of a tractor trailer unit when he experienced difficulty in getting the driver's attention.
Given the court's ruling on defendant's motion for summary judgment, the court has limited its discussion of the evidence to those facts that the court finds to be significant. In view of CT Page 3706 its ruling, the court need not discuss the applicable law of negligence. However, it is the court's finding that based on the evidence presented at trial, the sole proximate cause of Harron Waller's death is the conduct of Yolanda Daniels, as stated earlier. The court finds no negligence on the part of the State of Connecticut or Trooper Cynthia Peruginni.
COFIELD, J.